**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| GEORGE GOUNARIS, on behalf of himself and all others similarly situated, | Case no. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| ASCENSION HEALTH, | **DEMAND FOR A JURY TRIAL** |
| Defendant. | |

Plaintiff George Gounaris ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant Ascension Health ("Ascension") as an individual and on behalf of all others similarly situated, and alleges, upon information and belief, except as to his own actions, the investigation of counsel, and facts that are a matter of public record:

## INTRODUCTION

1.      This civil action pursues monetary damages as well as injunctive and declaratory relief from Defendant Ascension, stemming from its negligence in safeguarding specific Personally Identifiable Information ("PII") and Protected Health Information ("PHI").

2.      On information and belief, on or around May 9, 2024, Ascension's network systems were unauthorizedly accessed in a ransomware attack, resulting in the unauthorized disclosure of the PII and PHI of Plaintiff and the Class Members (the "Data Breach"). Such information encompasses, but is not limited to, names, dates of birth, patient records, Social Security numbers, and other sensitive PHI (collectively, "Private Information").

3.       Ascension is a Catholic health-system that "includes approximately 134,000 associates, 35,000 affiliated providers and 140 hospitals, serving communities in 19 states and the

District of Columbia."[1]

4.      Plaintiff and Class Members entrusted their sensitive personal information to the Defendant, with the mutual understanding that it would be protected against disclosure. However, due to the Data Breach, this information was targeted, compromised, and unlawfully accessed.

5.      Ascension systematically collected and maintained specific PII and PHI of the Plaintiff and the putative Class Members (defined below). These individuals are current or former patients of the Defendant.

6.      Upon information and belief, the Data Breach compromised Private Information, including the Plaintiff's and Class Members' PII and PHI. These categories are defined under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

7.      The Private Information compromised in the Data Breach was exfiltrated by cybercriminals and remains in their possession. These cybercriminals target Private Information for its value to identity thieves.

8.      As a result of the Data Breach, Plaintiff and Class Members suffered concrete injuries, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) loss or diminished value of Private Information; (iv) lost time and opportunity costs associated with mitigating the consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk to their Private Information, which: (a) remains unencrypted and accessible to unauthorized third parties; and (b) is still backed up in Ascension's possession, subject to further unauthorized disclosures unless appropriate and adequate protective measures are implemented.

9.      The Data Breach directly resulted from Ascension's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect its patients' Private

---

[1] https://about.ascension.org/about-us (last accessed May 22, 2024).

Information from a foreseeable and preventable cyber-attack.

10.     Further, upon information and belief, Ascension was targeted for a cyber-attack because it is a healthcare entity that collects and maintains highly valuable Private Information on its systems.

11.     Ascension maintained, used, and shared Private Information in a reckless manner. Specifically, Private Information was used and transmitted by Ascension in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and the potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Ascension. Therefore, Ascension was on notice that failing to take the necessary steps to secure the Private Information from those risks left that data in a dangerous condition.

12.     Ascension disregarded the rights of Plaintiff and Class Members by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; neglecting to implement standard and reasonably available steps to prevent the Data Breach; and failing to notify Plaintiff and Class Members of the Data Breach promptly and accurately.

13.     Due to Defendant's negligent conduct, Plaintiff's and Class Members' identities are now at risk, as the Private Information they entrusted to Defendant has been accessed and acquired by data thieves.

14.     With the Private Information accessed in the Data Breach, data thieves have already perpetrated identity theft and fraud. Furthermore, they could potentially commit various crimes in the future, such as opening new financial accounts in Class Members' names, obtaining loans in Class Members' names, using their information to access government benefits, filing fraudulent tax returns, obtaining driver's licenses with Class Members' names but with another person's photograph, and providing false information to law enforcement during an arrest.

15.     The Data Breach has exposed Plaintiff and Class Members to a heightened and imminent risk of fraud and identity theft. Consequently, they must now diligently monitor their financial accounts to safeguard against identity theft, both presently and in the future.

16.     Plaintiff and Class Members may also face out-of-pocket expenses, such as purchasing credit monitoring services, implementing credit freezes, obtaining credit reports, or adopting other protective measures to prevent and identify instances of identity theft.

17.     Plaintiff initiates this class action lawsuit on behalf of all those similarly situated to address Ascension's inadequate safeguarding of Class Members' Private Information, which it collected and maintained. Additionally, the lawsuit aims to hold Ascension accountable for failing to provide timely and adequate notice to Plaintiff and other Class Members regarding the unauthorized access of their information by an unknown third party and the precise nature of the accessed information.

18.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was compromised during the Data Breach.

19.     Further, Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class, including Plaintiff, are citizens of states different from Defendant.

21.     This Court has jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. The Defendant's principal place of business is located within this District, indicating a deliberate engagement with the markets here. Consequently, the exercise of jurisdiction by this Court is not only justified but also appropriate, given the Defendant's intentional involvement in this District's economic activities.

22.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) due to the Defendant's principal place of business being situated within this District. Moreover, a significant portion of the events and omissions that form the basis of this action transpired within this District. Hence, it is fitting that this Court serves as the venue for adjudicating this matter.

## PARTIES

23.     George Gounaris is a resident and citizen of Indianapolis, Indiana and has been a patient of Ascension St. Vincent Hospital, receiving ongoing medical care since the mid-1990s. Ascension obtained and stored Plaintiff's Private Information in connection with his treatment at Ascension St. Vincent Hospital.

24.     Defendant, Ascension Health, is a non-profit corporation properly recognized and sanctioned by the laws of the State of Missouri, with its headquarters located at 4600 Edmundson Road, St., St. Louis, Missouri 63134, in the County of St. Louis.

25.     Defendant, Ascension Health has 140 hospitals, serving communities in 19 states and the District of Columbia.

## FACTUAL ALLEGATIONS

***Ascension's Business***

26.     Ascension is a Catholic health system comprising approximately 134,000 associates, 35,000 affiliated providers, and 140 hospitals. Its services span across communities in 19 states and

the District of Columbia.[2]

27.      Plaintiff and Class Members are individuals who are both current and former patients of Ascension.

28.      During their interactions with Ascension, patients, including Plaintiff and Class Members, entrusted the Ascension with their sensitive Private Information.

29.      Upon information and belief, as part of the process of collecting Private Information from patients, including Plaintiff, Ascension pledged to ensure confidentiality and adequate security for the data it gathered from patients. This commitment was articulated through its relevant privacy policy and other disclosures, adhering to statutory privacy requirements.

30.      Indeed, Defendant asserts on its website that: "[t]he Site has security measures in place to protect against the loss, misuse, or alteration of information under Our control."[3]

31.      Plaintiff and the Class Members, whether as patients of or purchasers of medical equipment from Ascension, trusted these assurances and counted on this sophisticated business entity to maintain the confidentiality and security of their sensitive Private Information. They expected Ascension to use this information solely for business purposes and to make only authorized disclosures. Patients, in general, insist on security measures to protect their Private Information, particularly when it involves sensitive details like Social Security numbers.

**The Breach**

32.      In or about May 2024, Ascension posted a notice to its website (the "Online Notice"), informing Plaintiff and Class Members that:

> On Wednesday, May 8, we detected unusual activity on select technology network systems, which we now believe is due to a cybersecurity event. At this time we continue to investigate the situation. We responded immediately, initiated our investigation and activated our remediation efforts. Access to some systems have been interrupted as this process

---

[2] *Id.*
[3] https://about.ascension.org/privacy (last accessed May 22, 2024).

continues.

> Our care teams are trained for these kinds of disruptions and have initiated procedures to ensure patient care delivery continues to be safe and as minimally impacted as possible. There has been a disruption to clinical operations, and we continue to assess the impact and duration of the disruption.

> We have engaged Mandiant, a third party expert, to assist in the investigation and remediation process, and we have notified the appropriate authorities. Together, we are working to fully investigate what information, if any, may have been affected by the situation. Should we determine that any sensitive information was affected, we will notify and support those individuals in accordance with all relevant regulatory and legal guidelines.[4]

33.     The Online Notice failed to include crucial information such as the date(s) of the Data Breach, the identity of the cybercriminals responsible, the specifics regarding the root cause of the breach, the vulnerabilities exploited, and the remedial actions taken to prevent future breaches. To this day, these critical details have not been explained or clarified to Plaintiff and Class Members, who maintain a vested interest in safeguarding their Private Information.

34.     The provided "disclosure" lacks substance, failing to provide Plaintiff and Class Members with the necessary specifics regarding the critical facts of the Data Breach. Without such essential details, the ability of Plaintiff and Class Members to effectively mitigate the resulting harms is significantly compromised.

35.     Despite the intentional opacity from Ascension regarding the root cause of this incident, the Online Notice provides several discernible facts: a) the Data Breach was perpetrated by cybercriminals; b) these cybercriminals initially breached Ascension's networks and systems, subsequently exfiltrating data, colloquially termed as "stealing" data; and c) within Ascension's networks and systems, the cybercriminals specifically targeted information, potentially including Plaintiff's and Class Members' PHI, PII, and other sensitive data for download and theft.

36.     Furthermore, Ascension's Online Notice lacks clarification on whether any efforts

---

[4] Online Notice: A sample copy is available at https://about.ascension.org/news/2024/05/network-interruption-update (last accessed May 22, 2024).

were made to reach out to Class Members whose data was compromised in the Data Breach. There is no indication of whether the Defendant attempted to ascertain if any Class Members experienced misuse of their data, or if Ascension was receptive to hearing about such misuse. Additionally, there is no mention of any mechanism established for Class Members to report instances of data misuse.

37.     Ascension was bound by various obligations stemming from the FTC Act, HIPAA, contractual agreements, common law principles, and industry standards to maintain the confidentiality of Plaintiff's and Class Members' Private Information and safeguard it against unauthorized access and disclosure.

38.     Ascension failed to implement reasonable security procedures and practices commensurate with the sensitivity of the information entrusted to them by Plaintiff and Class Members. This lapse led to the exposure of Private Information, which could have been mitigated through measures such as encryption or timely deletion when the information was no longer required.

39.     The attacker successfully accessed and obtained files containing unencrypted Private Information belonging to Plaintiff and Class Members. As a result of the Data Breach, Private Information belonging to Plaintiff and Class Members was compromised and stolen.

40.     Plaintiff further holds the belief that both his Private Information and that of the Class Members were subsequently sold on the dark web in the aftermath of the Data Breach. This assertion aligns with the typical modus operandi of cybercriminals who engage in such cyber-attacks.

**Preventable Data Breaches: Safeguarding Against Unnecessary Compromises**

41.     Ascension neglected to employ adequate security procedures and practices suitable for the sensitive nature of the information entrusted to them by Plaintiff and Class Members. This failure resulted in the exposure of Private Information, highlighting a lack of measures such as encryption or timely deletion when the information was no longer necessary.

42.     Ascension could have averted this Data Breach by taking necessary precautions such as appropriately encrypting or implementing robust protection measures for their equipment and computer files containing Private Information.

43.     As stated by the Federal Bureau of Investigation, "[P]revention is the most effective defense against ransomware, and it is crucial to implement precautionary measures for protection."[5]

44.     To effectively prevent and detect cyber-attacks and ransomware incidents, the Defendant could have implemented the following measures, as recommended by the United States Government:

- Awareness and Training Program: Develop and implement a comprehensive awareness and training program to educate employees and individuals about the threat of ransomware and how it is typically delivered.

- Strong Spam Filters: Enable robust spam filters to block phishing emails from reaching end users. Utilize technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to authenticate inbound email and prevent email spoofing.

- Email Scanning: Scan all incoming and outgoing emails to detect threats and filter out executable files from reaching end users.

- Firewall Configuration: Configure firewalls to block access to known malicious IP addresses.

- Patch Management: Regularly patch operating systems, software, and firmware on devices. Consider implementing a centralized patch management system for efficiency.

- Anti-virus and Anti-malware Programs: Set up anti-virus and anti-malware programs to conduct automatic regular scans.

- Privileged Account Management: Manage privileged accounts based on the principle of least privilege, restricting administrative access only to those who absolutely require it and limiting usage to necessary situations.

- Access Controls: Configure access controls, including file, directory, and network share permissions, with the principle of least privilege in mind.

---

[5] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited May 22, 2024).

- Macro Script Disabling: Disable macro scripts from office files transmitted via email. Consider using Office Viewer software for opening Microsoft Office files transmitted via email instead of full office suite applications.

- Software Restriction Policies (SRP): Implement SRP or similar controls to prevent programs from executing from common ransomware locations.

- Remote Desktop Protocol (RDP) Disablement: Consider disabling Remote Desktop Protocol (RDP) if it is not in active use.

- Application Whitelisting: Utilize application whitelisting to only allow systems to execute programs that are known and permitted by security policy.

- Virtualized Environment Execution: Execute operating system environments or specific programs in a virtualized environment to enhance security.

- Data Categorization and Separation: Categorize data based on organizational value and implement both physical and logical separation of networks and data for different organizational units.[6]

45.   To effectively prevent and detect cyber-attacks or ransomware incidents, Ascension could have implemented the following measures, as recommended by the Microsoft Threat Protection Intelligence Team:

> **Secure Internet-Facing Assets**
>
> Apply latest security updates
> Use threat and vulnerability management
> Perform regular audit; remove privileged credentials;
>
> **Thoroughly investigate and remediate alerts**
>
> Prioritize and treat commodity malware infections as potential full compromise;
>
> **Include IT Pros in security discussions**
>
> Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;
>
> **Build credential hygiene**
>
> Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

---

[6] *Id.* at 3-4.

**Apply principle of least-privilege**

Monitor for adversarial activities
Hunt for brute force attempts
Monitor for cleanup of Event Logs
Analyze logon events;

**Harden infrastructure**

Use Windows Defender Firewall
Enable tamper protection
Enable cloud-delivered protection
Turn on attack surface reduction rules and [Antimalware Scan Interface] for
Office [Visual Basic for Applications].[7]

46.     Considering that Ascension was entrusted with storing the Private Information of both current and former patients, it was imperative for them to implement all of the aforementioned measures to effectively prevent and detect cyberattacks.

47.     The Data Breach underscores Ascension's failure to sufficiently implement one or more of the aforementioned measures aimed at preventing cyberattacks. This lapse led to the Data Breach, enabling data thieves to access and acquire the Private Information of, according to available information, thousands to tens of thousands of individuals, including Plaintiff and Class Members.

***Ascension's Acquisition, Collection, and Storage of Patients' Private Information***

48.     Ascension accumulates, gathers, and maintains an extensive volume of Private Information concerning both its present and past patients.

49.     As a prerequisite for becoming a patient of Ascension or purchasing medical supplies from the organization, Ascension mandates that patients and other individuals entrust it with highly sensitive personal information.

50.     By acquiring, gathering, and utilizing the Private Information of Plaintiff and Class

---

[7] *See* Human-operated ransomware attacks: A preventable disaster (Mar. 5, 2020), *available at:* https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/(last accessed May 22, 2024).

Members, Ascension undertook legal and equitable obligations. It was well aware, or should have been, of its responsibility to safeguard Plaintiff's and Class Members' Private Information from unauthorized disclosure.

51.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Ascension absent a promise to safeguard that information.

52.     Upon information and belief, during the process of collecting Private Information from patients, including Plaintiff, Ascension purportedly pledged to ensure confidentiality and sufficient security for their data. This commitment was purportedly articulated through its relevant privacy policy and other disclosures, in adherence to statutory privacy mandates.

53.     Certainly, on its website, Ascension assures that the Site is equipped with security measures to prevent loss, misuse, or alteration of information within their purview.[8]

54.     Plaintiff and the Class Members placed their trust in Defendant to uphold the confidentiality and secure maintenance of their Private Information, to utilize this data solely for business purposes, and to make authorized disclosures of this information only.

**Ascension's Awareness of Cybersecurity Risks in Healthcare Entities Handling Private Information**

55.     Given the significant rise in cyber-attacks and data breaches targeting healthcare entities responsible for collecting and storing Private Information, such as Ascension, prior to the breach date, Ascension's data security obligations were of paramount importance.

56.     Data breaches, including those directed at healthcare entities housing Private Information within their systems, have proliferated extensively.

57.     In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data

---

[8] FN3, *supra.*

breaches, resulting in 66,658,764 individuals' personal information being compromised.[9]

58.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including Change Healthcare (potentially hundreds of millions of patients, March 2024), HCA Healthcare (11-million patients, July 2023), Managed Care of North America (8-million patients, March 2023), PharMerica Corporation (5-million patients, March 2023), HealthEC LLC (4-million patients, July 2023), ESO Solutions, Inc. (2.7-million patients, September 2023), Prospect Medical Holdings, Inc. (1.3-million patients, July-August 2023), Ascension knew or should have known that its electronic records would be targeted by cybercriminals.

59.     Certainly, cyber-attacks, akin to the one experienced by Ascension, have garnered such notoriety that both the Federal Bureau of Investigation and the U.S. Secret Service have issued warnings to potential targets, aiming to alert them and fortify their readiness against potential attacks. As elaborated in one report, smaller entities tasked with storing Private Information are particularly appealing to ransomware criminals due to their typically weaker IT defenses and strong incentive to swiftly regain access to their data.[10]

60.     Moreover, as businesses increasingly rely on computer systems to conduct their operations, for instance, through remote work necessitated by the Covid-19 pandemic, and the proliferation of the Internet of Things (IoT), the threat posed by cybercriminals is amplified. This underscores the imperative for implementing sufficient administrative, physical, and technical safeguards.[11]

61.     Ascension was well aware that unprotected or exposed Private Information, held by

---

[9] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/ (last accessed May 22, 2024).

[10] https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last accessed May 22, 2024).

[11] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last accessed May 22, 2024).

health companies like itself, holds significant value and is highly coveted by malicious third parties aiming to unlawfully profit from such information through unauthorized access.

62.    Ascension was aware, or reasonably should have been aware, of the criticality of safeguarding the Private Information belonging to Plaintiff and Class Members. Moreover, it was cognizant of the foreseeable repercussions in the event of a breach in its data security system, notably the substantial costs that would burden Plaintiff and Class Members as a consequence of such a breach.

63.    Plaintiff and Class Members are now confronted with enduring years of persistent monitoring of their financial and personal records, along with a loss of privacy rights. This ongoing surveillance inflicts and will persist in causing significant damages to the Class, compounded by the potential fraudulent exploitation of their Private Information.

64.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

65.    The consequences stemming from Defendant's failure to secure the Private Information of Plaintiff and Class Members are enduring and profound. Following the theft of Private Information, the potential for fraudulent exploitation and the resultant harm to victims can persist for years.

66.    As a healthcare entity responsible for safeguarding the Private Information of its patients, Ascension was fully aware, or should have been, of the criticality of protecting the Private Information entrusted to it by Plaintiff and Class Members. Moreover, Ascension should have recognized the foreseeable consequences should its data security systems be breached, including the substantial costs imposed on Plaintiff and Class Members. However, Ascension failed to implement sufficient cybersecurity measures to avert the Data Breach.

*Value of Private Information*

67.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[12] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[13]

68.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[14]

69.     Personal Information can be sold at a price ranging from $40 to $200 or even higher.[15]

70.     Furthermore, Social Security numbers, which, according to available information, were compromised for some Class Members in the Data Breach, represent one of the most detrimental forms of Private Information to have stolen. This is due to the multitude of fraudulent purposes to which they may be put, and the significant challenge individuals face in altering them.

71.     As per the Social Security Administration, whenever an individual's Social Security

---

[12] 17 C.F.R. § 248.201 (2013).

[13] *Id.*

[14] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed May 22, 2024).

[15] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at:* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed May 22, 2024); (Criminals can also purchase access to entire company data breaches from $900 to $4,500) https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed May 22, 2024).

number is compromised, the risk of unauthorized access to various sensitive records escalates. This includes bank accounts, credit cards, driving records, tax and employment histories, and other private information. Furthermore, since many organizations still rely on Social Security numbers as the primary identifier, the exposure to identity theft and fraud persists.

72.     The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[16]

73.     In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[17]

74.     Additionally, altering or invalidating a stolen Social Security number is a complex process. An individual cannot acquire a new Social Security number without substantial paperwork and evidence demonstrating actual misuse. In essence, preemptive measures to safeguard against potential misuse of a Social Security number are not feasible; an individual must provide evidence of ongoing fraudulent activity to qualify for a new number.

75.     However, obtaining a new Social Security number may not necessarily resolve the issue. Julie Ferguson from the Identity Theft Resource Center explains that credit bureaus and banks

---

[16] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed May 22, 2024).
[17] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last accessed May 22, 2024).

can swiftly link the new number to the old one, resulting in the transfer of all previous negative information to the new Social Security number.

76.     For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at \*12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant  a ccess to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at \*4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiffs' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment."  Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.").

77.     Theft of PHI, which, upon information and belief, was compromised in the Data Breach, is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[18]

78.     The increased efficiency of electronic health records introduces the risk of privacy

---

[18] *Medical I.D. Theft*, EFraudPrevention, https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20you r,credit%20report%20may%20be%20affected (last accessed May 22, 2024).

breaches. These records contain a wealth of sensitive information, including patient data, diagnoses, lab results, medications, prescriptions, and treatment plans, all of which are highly valuable to cybercriminals. A single patient's comprehensive record can fetch hundreds of dollars on the dark web. Consequently, PHI and PII have become sought-after commodities, fueling a thriving "cyber black market" where criminals openly trade stolen payment card numbers, Social Security numbers, and other personal data on various underground internet platforms. Notably, the pharmaceutical industry is particularly vulnerable to cyberattacks and has been significantly impacted by incidents like the Data Breach under discussion.

79.     Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[19] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[20] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[21] According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[22]

80.     According to Pam Dixon, executive director of World Privacy Forum, medical identity theft is an escalating and perilous crime that severely limits its victims' options for recovery. Victims often endure financial consequences, and, even more distressingly, they frequently encounter inaccuracies added to their personal medical records as a result of the thief's actions.[23]

---

[19] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last accessed May 22, 2024).
[20] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed May 22, 2024).
[21] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches (last accessed May 22, 2024).
[22] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals,* Naked Security (Oct. 3, 2019), https://news.sophos.com/en-us/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/ (last accessed May 22, 2024).
[23] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last accessed May 22, 2024).

81.     A study conducted by Experian revealed that the average cost of medical identity theft per incident is approximately $20,000. Additionally, the majority of victims of medical identity theft are compelled to cover out-of-pocket expenses for healthcare services they did not receive in order to reinstate their coverage. Furthermore, almost half of medical identity theft victims lose their healthcare coverage following the incident, while nearly one-third experience an increase in insurance premiums. Alarmingly, 40 percent of victims are unable to fully resolve their identity theft ordeal.[24]

82.     Given the foregoing, the information compromised in the Data Breach holds far greater value compared to the loss of credit card information in a retailer data breach. In the latter scenario, victims have the option to cancel or close their credit and debit card accounts. However, the information compromised in this Data Breach cannot be simply "closed" and is exceedingly challenging, if not impossible, to alter.

83.     In addition to other forms of fraud, identity thieves may fraudulently acquire driver's licenses, government benefits, medical services, and housing, or even provide false information to law enforcement.

84.     The fraudulent activity stemming from the Data Breach might remain undetected for an extended period, possibly years. There can be a considerable delay between the occurrence of harm and its detection, as well as between the theft of Private Information and its utilization. This was highlighted in a study conducted by the U.S. Government Accountability Office (GAO) on data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting

---

[24] *Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last accessed May 22, 2024).

from data breaches cannot necessarily rule out all future harm.[25]

85.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**Ascension's Noncompliance with FTC Guidelines**

86.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

87.     In 2016, the FTC revised its publication, "Protecting Personal Information: A Guide for Business," which outlined cybersecurity guidelines for businesses. These guidelines emphasize the importance of safeguarding personal patient information, appropriately disposing of unnecessary personal information, encrypting information stored on computer networks, comprehending network vulnerabilities, and implementing policies to address any security issues.[26]

88.     The guidelines also advocate for businesses to employ an intrusion detection system to promptly detect breaches as they happen, monitor all incoming traffic for signs of attempted system hacking, be vigilant for unusually large data transmissions from the system, and have a prepared response plan in place in the event of a breach.[27]

89.     Furthermore, the FTC advises companies to refrain from retaining Private Information for longer than necessary for transaction authorization, restrict access to sensitive data, mandate the use of complex passwords on networks, employ industry-proven security methods,

---

[25] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:*
https://www.gao.gov/assets/gao-07-737.pdf (last accessed May 22, 2024).
[26] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at
https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-
information.pdf (last accessed May 22, 2024).
[27] *Id.*

monitor the network for any suspicious activity, and verify that third-party service providers have adopted reasonable security measures.

90.     The FTC has taken enforcement actions against businesses for inadequately safeguarding patient data, considering the failure to implement reasonable and appropriate measures to prevent unauthorized access to confidential patient data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions provide additional clarification on the steps businesses must take to fulfill their data security obligations.

91.     These FTC enforcement actions include actions against healthcare providers like Ascension. *See, e.g., In the Matter of LabMd, Inc., A Corp*, 2016-2 Trade Cas. (Henry Ford) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

92.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Ascension, for failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Ascension's duty in this regard.

93.     Ascension failed to properly implement basic data security practices.

94.     Ascension's failure to employ reasonable and appropriate measures to protect against unauthorized access to the Private Information of its patients or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

95.     Upon information and belief, Ascension was at all times fully aware of its obligation to protect the Private Information of its patients, Ascension was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Ascension's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**Ascension's Noncompliance with HIPAA Guidelines**

96.     Ascension is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

97.     Ascension is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[37] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

98.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

99.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

100.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

101.    "Electronic protected health information" is "individually identifiable health

information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

102.    HIPAA's Security Rule mandates that Ascension:

    a.    Safeguard the confidentiality, integrity, and availability of all electronic protected health information created, received, maintained, or transmitted by the covered entity or business associate;

    b.    Shield against any reasonably anticipated threats or hazards to the security or integrity of such information;

    c.    Guard against any reasonably anticipated uses or disclosures of such information that are not permitted; and

    d.    Ensure compliance by its workforce.

103.    HIPAA further requires Ascension to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

104.    HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

105.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Ascension to provide notice of the Data Breach to each affected individual "without unreasonable

delay and in no case later than 60 days following discovery of the breach."[28]

106.    HIPAA requires a covered entity to have and apply appropriate sanctions against patients of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

107.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

108.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e- and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[39] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-." US Department of Health & Human Services, Guidance on Risk Analysis.[29]

***Ascension's Noncompliance with Industry Standards***

109.    Experts in cybersecurity frequently highlight healthcare entities as particularly

---

[28] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last accessed May 22, 2024).
[29] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last accessed May 22, 2024).

vulnerable to cyberattacks due to the high value of the Private Information they collect and maintain.

110.     Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of Private Information, like Ascension, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Ascension failed to follow these industry best practices, including a failure to implement multi-factor authentication.

111.     Standard cybersecurity practices for healthcare entities include installing robust malware detection software, monitoring and limiting network ports, securing web browsers and email systems, setting up firewalls, switches, and routers, and ensuring physical security systems are protected. Additionally, it is essential to safeguard communication systems and train staff on critical security protocols. Ascension failed to adhere to these best practices, including neglecting to properly train staff.

112.     Ascension failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

113.     The aforementioned frameworks represent established industry standards for healthcare entities. Based on available information, Ascension failed to comply with one or more of these accepted standards, thereby allowing the threat actor to exploit vulnerabilities and cause the data breach.

*Common Injuries*

114.    As a result of Ascension's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the hands of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent. Consequently, Plaintiff and Class Members have sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the effects of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk to their Private Information, which remains unencrypted and accessible to unauthorized third parties and is still backed up in Defendant's possession, subject to further unauthorized disclosures unless Defendant implements appropriate and adequate protective measures.

*Data Breaches Heighten Victims' Risk of Identity Theft*

115.    The unencrypted Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

116.    Unencrypted Private Information can also be obtained by companies that use it for targeted marketing without the consent of the Plaintiff and Class Members. In essence, unauthorized individuals can easily access the Private Information of the Plaintiff and Class Members.

117.    The connection between a data breach and the risk of identity theft is straightforward and well-established. Criminals acquire Private Information to monetize it, often by selling the stolen data on the black market. Other criminals then purchase this information to commit various identity theft-related crimes, as discussed below.

118.    Plaintiff's and Class Members' Private Information holds significant value for hackers and cyber criminals. The data stolen in the Data Breach has been, and will continue to be,

used in various malicious ways, allowing criminals to exploit Plaintiff and Class Members and profit from their misfortune.

119.     Recognizing the dangers posed by the exposure of Social Security numbers, state legislatures have implemented laws to mitigate these risks. Social Security numbers can be exploited for fraudulent activities and to obtain sensitive personal, financial, medical, and familial information, potentially causing significant harm to individuals. Initially intended for federal Social Security System administration, these numbers have since become widely used for identity verification purposes.

120.     Despite the risk of fraud associated with the theft of Social Security numbers, "just five of the nation's largest 25 banks have stopped using the numbers to verify a patient's identity after the initial account setup[.]"[30] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account."

121.     One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[31]

122.     Through "Fullz" packages, cyber-criminals can merge two sources of Private

---

[30] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/ (last accessed May 22, 2024).

[31] Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/), (last accessed May 22, 2024).

Information, combining unregulated data available elsewhere with criminally obtained data. This process results in remarkably comprehensive and accurate dossiers on individuals.

123.    The emergence of "Fullz" packages indicates that the stolen Private Information from the Data Breach can readily be matched with Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. Essentially, even if specific details like emails, phone numbers, or credit card numbers were not part of the exfiltrated Private Information in the Data Breach, criminals can effortlessly compile a Fullz package and repeatedly sell it at inflated prices to unethical operators and criminal entities (like illicit telemarketers and scammers).

124.    The presence and widespread availability of "Fullz" packages indicate that the Private Information pilfered from the data breach can effortlessly be correlated with the unregulated data, such as insurance information, belonging to the Plaintiff and other Class Members.

125.    Consequently, even if specific details like insurance information were not compromised in the data breach, criminals can still effortlessly compile a comprehensive "Fullz" package. This detailed dossier can then be sold—and continually resold—to dishonest operators and other criminals, including illegal and fraudulent telemarketers.

***Mitigating Risk: Time Lost in Preventing Identity Theft and Fraud***

126.    In light of the acknowledged threat of identity theft, when a Data Breach transpires, and an individual receives notification from a company regarding the compromise of their Private Information, as in this instance, it is reasonable to anticipate that they will take measures and dedicate time to address the perilous scenario. This entails educating themselves about the breach and undertaking actions to minimize the risk of falling victim to identity theft or fraud. Neglecting to allocate time to review accounts or credit reports could potentially exacerbate financial harm. However, the valuable resource and asset of time are squandered in this process.

127.    Plaintiff and Class Members have already devoted significant time to, and will

continue to invest time in the future, undertaking various prudent measures. These include researching and validating the authenticity of the Data Breach and diligently monitoring their financial accounts for any signs of suspicious activity, which could potentially take years to uncover. Consequently, the Data Breach has inflicted tangible harm on Plaintiff and Class Members in the form of irreplaceable lost time dedicated to mitigation efforts.

128.    Plaintiff's actions to mitigate the situation align with findings from the U.S. Government Accountability Office, as outlined in a 2007 report on data breaches. The report highlighted that individuals affected by identity theft encounter significant expenses and invest considerable time in rectifying damage to their reputation and credit history.[32]

129.    Plaintiff's efforts to mitigate the situation align with the recommendations provided by the FTC for individuals affected by data breaches. These steps include contacting one of the credit bureaus to place a fraud alert (with consideration for an extended fraud alert lasting up to seven years if identity theft occurs), reviewing credit reports, contacting companies to dispute fraudulent charges, implementing a credit freeze, and rectifying inaccuracies on credit report.[33]

**Diminution of Value of Private Information**

130.    PII and PHI constitute valuable property rights.[34] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

---

[32] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last accessed May 22, 2024).

[33] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last accessed May 22, 2024).

[34] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p.2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

131.     Sensitive PII can fetch prices as high as $363 per record, as reported by the Infosec Institute. Additionally, there exists a thriving legitimate marketplace for PII. In 2019 alone, the data brokering industry was estimated to be valued at around $200 billion.[35]

132.     The data marketplace has reached a level of sophistication where patients have the option to directly sell their non-public information to a data broker. Subsequently, these brokers aggregate the data and furnish it to marketers or app developers.

133.     Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[36]

134.     Theft of PHI carries significant consequences. A thief could potentially exploit your identity or health insurance details to seek medical treatment, obtain prescription medications, submit claims to your insurance provider, or access other healthcare services. If the thief's health information becomes intertwined with data breach victim's, it could impact victim's medical treatment, insurance coverage, payment records, and even victim's credit report.

135.     The Data Breach has led to the compromise and unauthorized release of Plaintiff's and Class Members' Private Information, which holds inherent market value in both legitimate and illicit markets. This unauthorized transfer of value occurred without any compensation provided to Plaintiff or Class Members for their property, resulting in an economic loss. Furthermore, the Private Information is now easily accessible, and its exclusivity has been lost, leading to further devaluation.

136.     At all relevant times, Ascension knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Ascension's data security system was breached,

---

[35] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed May 22, 2024).
[36] https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last accessed May 22, 2024).

including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

137.    The fraudulent activity resulting from the Data Breach may not come to light for years.

138.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

139.    Ascension was, or should have been, fully aware of the unique type and the significant volume of data on Ascension's network, amounting to, upon information and belief, thousands to tens of thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

140.    The injuries to Plaintiff and Class Members were directly and proximately caused by Ascension's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary**

141.    Considering the nature of the targeted attack in this case, involving sophisticated criminal activity and the sensitive Private Information at stake, there is a high likelihood that entire datasets of stolen information have either been or will be circulated on the black market or dark web. Criminals intend to exploit this Private Information for identity theft crimes, such as opening bank accounts in victims' names for purchases or money laundering, filing fraudulent tax returns, securing loans or lines of credit, or submitting false unemployment claims.

142.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected

fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

143.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

144.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

**Loss of Benefit of The Bargain**

145.    Furthermore, Ascension's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Ascension and/or its agents for the provision of medical services, Plaintiff and other reasonable patients understood and expected that they were, in part, paying for the services and necessary data security to protect the Private Information, when in fact, Ascension did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Ascension.

**Plaintiff George Gounaris's Experience**

146.    Plaintiff George Gounaris is a current patient of Ascension St. Vincent Hospital and has been a patient of Ascension since the mid-1990s.

147.    He was required to provide his Private Information to Ascension as a condition to receiving medical services at Ascension St. Vincent Hospital.

148.    Upon information and belief, at the time of the Data Breach, Ascension maintained Plaintiff's Private Information in its system.

149.    Plaintiff Gounaris is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He

has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Ascension had he known of Ascension's lax data security policies.

150.    Upon information and belief, Plaintiff's Private Information was compromised in the Data Breach.

151.    In response to the Data Breach, Plaintiff diligently undertook measures to mitigate its effects. This included thorough research to confirm the breach's authenticity and continuous monitoring of financial accounts for any suspicious transactions, which may remain undetected for years. The Plaintiff has invested considerable time addressing the fallout of the breach—time that would have otherwise been allocated to work or leisure activities. Regrettably, the time is irretrievably lost and cannot be reclaimed.

152.    The Plaintiff has suffered tangible harm resulting from the compromise of his Private Information due to the Data Breach, encompassing but not limited to: (i) an invasion of privacy; (ii) the unlawful appropriation of his Private Information; (iii) a reduction or loss in the value of Private Information; (iv) expended time and opportunity costs incurred in mitigating the actual repercussions of the Data Breach; (v) the forfeiture of expected benefits from the agreement; (vi) forgone opportunity costs related to mitigating the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) enduring and potentially escalating exposure of his Private Information to risk, while it remains unencrypted and susceptible to unauthorized access and misuse by third parties, and while it remains within the Ascension 's possession, subject to further unauthorized disclosure until appropriate and sufficient protective measures are implemented.

153.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Ascension has still not fully informed him of key details about the Data Breach's occurrence.

154.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

155.     As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

156.     Plaintiff Gounaris has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Ascension's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

157.     Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5), Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All citizens and residents of the United States whose Private Information was accessed and/or obtained by an unauthorized entity following the data breach disclosed by the Defendant Ascension Health in or around May 2024 (the "Class").**

158.     Excluded from the Class are the following individuals and/or entities: Ascension and Ascension's parents, subsidiaries, affiliates, officers and directors, and any entity in which Ascension have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family patients.

159.     Plaintiff reserves the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

160.     <u>Numerosity</u>: The patients of the Class are so numerous that joinder of all patients is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiff and exclusively in the possession of Ascension, upon information and belief,

thousands of individuals were impacted. The Class is apparently identifiable within Ascension's records, and Ascension has already identified these individuals (as evidenced by sending them breach notification letters).

161.   <u>Commonality</u>: Common questions of law and fact exist as to all patients of the Class and predominate over any questions affecting solely individual patients of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, including the following:

a.   Whether and to what extent Ascension had a duty to protect the Private Information of Plaintiff and Class Members;

b.   Whether Ascension had respective duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c.   Whether Ascension had respective duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d.   Whether Ascension failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e.   Whether and when Ascension actually learned of the Data Breach;

f.   Whether Ascension adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g.   Whether Ascension violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h.   Whether Ascension failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.   Whether Ascension adequately addressed and fixed the vulnerabilities which

permitted the Data Breach to occur;

> j.   Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Ascension's wrongful conduct;

> k.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

162.   <u>Typicality:</u> Plaintiff's claims are typical of those of the other patients of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other patient of the Class.

163.   <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Ascension acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Ascension's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Ascension 's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

164.   <u>Adequacy:</u> The Plaintiff will serve as a fair and effective representative for the Class Members, possessing no conflicting interests that would hinder the protection of their rights. The relief sought by the Plaintiff aligns with the collective interests of the Class, without any adverse implications for its members. The infringements upon the Plaintiff's rights and the damages incurred are emblematic of those experienced by other Class Members. Moreover, the Plaintiff has engaged legal counsel adept in navigating intricate class action and data breach litigation, demonstrating a commitment to vigorously pursue this case.

165.   <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available

methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Ascension. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

166.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Ascension would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

167.    The litigation of the claims brought herein is manageable. Ascension's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

168.    Adequate notice can be given to Class Members directly using information maintained in Ascension's records.

169.    Unless a Class-wide injunction is issued, Ascension may continue in its failure to

properly secure the Private Information of Class Members, Ascension may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Ascension may continue to act unlawfully as set forth in this Complaint.

170.     Further, Ascension has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

171.     Similarly, specific issues outlined in Rule 42(d)(1) warrant certification as they entail distinct yet shared concerns pivotal to advancing the resolution of this case and the interests of all parties involved. These issues include, but are not confined to:

   a.   Whether the Ascension failed to promptly notify both the Plaintiff and the class about the Data Breach;

   b.   Whether the Ascension bore a legal responsibility to exercise due diligence in the acquisition, storage, and protection of Private Information belonging to the Plaintiff and the Class;

   c.   Whether the security measures implemented by Ascension to safeguard their data systems aligned with industry best practices endorsed by data security experts;

   d.   Whether Ascension's omission of adequate protective security measures amounted to negligence;

   e.   Whether Ascension neglected to undertake commercially reasonable measures to secure patient Private Information; and

   f.   Whether adherence to data security recommendations outlined by the FTC and those advocated by data security experts could have feasibly prevented the occurrence of the Data Breach.

## **CAUSES OF ACTION**

### **COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

172.     Plaintiff re-alleges and incorporates by reference all preceding allegations, as if  fully set forth herein.

173.     Ascension requires its patients, including the Plaintiff and Class Members, to submit confidential Private Information as part of the standard process for receiving its services.

174.     Ascension gathered and stored the Private Information of Plaintiff and Class Members as part of its business of soliciting its services to its patients, which solicitations and services affect commerce.

175.     The Plaintiff and Class Members entrusted Ascension with their private information, expecting that the Ascension would protect and secure it.

176.     Ascension had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

177.     By voluntarily undertaking the responsibility to collect, store, share, and use this data for commercial gain, Ascension assumed a duty of care to employ reasonable measures to secure and safeguard its computer systems and the Private Information of Class Members contained within them. This duty included preventing unauthorized disclosure and protecting the information from theft. Additionally, Ascension was responsible for implementing processes to detect security breaches promptly and to notify affected individuals expeditiously in the event of a data breach.

178.     Ascension had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing

to use reasonable measures to protect confidential data.

179.    Ascension's duty to use reasonable security measures under HIPAA required Ascension to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

180.    Ascension owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the Private Information.

181.    Ascension's duty to employ reasonable security measures arose from the special relationship between Ascension and the Plaintiff and Class Members. This relationship was established because the Plaintiff and Class Members entrusted Ascension with their confidential private information as a necessary part of being patients.

182.    Ascension's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Ascension is bound by industry standards to protect confidential Private Information.

183.    Ascension was subject to an "independent duty," untethered to any contract between Ascension and Plaintiff or the Class.

184.    Ascension also had a duty to exercise appropriate clearinghouse practices to remove former patients' Private Information it was no longer required to retain pursuant to regulations.

185.    Moreover, Ascension had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

186.    Ascension had, and continues to have, a duty to adequately disclose if the private

information of the Plaintiff and Class Members in its possession might have been compromised, the manner in which it was compromised, the specific types of data affected, and the timing of the breach. Such notice is necessary to enable the Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft or fraudulent use of their private information by third parties.

187.    Ascension breached its duties under the FTC Act, HIPAA, and other relevant standards, demonstrating negligence by failing to implement reasonable measures to protect Class Members' Private Information. Specific negligent actions and oversights by the Ascension include, but are not limited to:

    a.  Neglecting to adopt, implement, and maintain sufficient security measures to safeguard Class Members' Private Information.

    b.  Inadequately monitoring the security of their networks and systems.

    c.  Allowing unauthorized access to Class Members' Private Information.

    d.  Failing to promptly detect that Class Members' Private Information had been compromised.

    e.  Neglecting to remove Private Information of former patients that was no longer required to be retained according to regulations.

    f.  Failing to promptly and adequately inform Class Members about the occurrence and extent of the Data Breach, preventing them from taking appropriate measures to mitigate the risk of identity theft and other damages.

188.    Ascension violated Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Ascension's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

189.     Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act and HIPAA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statutes were intended to guard against.

190.     Ascension's violation of Section 5 of the FTC Act and HIPAA constitutes negligence.

191.     The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

192.     A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Ascension's inadequate security practices.

193.     It was foreseeable that Ascension's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

194.     Ascension has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

195.     Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Ascension knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Ascension's systems or transmitted through third party systems.

196.     It was thus foreseeable that the failure to adequately safeguard Class Members' Private Information would lead to one or more forms of harm or injury to the Class Members.

197.    Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Ascension's possession.

198.    Ascension was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

199.    Ascension's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship.

200.    Ascension has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

201.    But for Ascension's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

202.    There is a close causal connection between Ascension's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Ascension's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

203.    As a direct and proximate result of Ascension's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages;

and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Ascension's possession and is subject to further unauthorized disclosures so long as Ascension fails to undertake appropriate and adequate measures to protect the Private Information.

204.    Additionally, as a direct and proximate result of Ascension's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Ascension's possession and is subject to further unauthorized disclosures so long as Ascension fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

205.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

206.    The Plaintiff and Class Members are also entitled to injunctive relief, which should compel the Ascension to: (i) Enhance its data security systems and monitoring procedures; (ii) Undergo annual audits of these systems and monitoring procedures in the future; and (iii) Ensure ongoing provision of sufficient credit monitoring services to all Class Members.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

207.    Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

208.    According to the Federal Trade Commission Act, 15 U.S.C. § 45, Ascension was obligated to furnish fair and adequate computer systems and data security practices to protect the private information of both the Plaintiff and Class Members.

209.    Ascension's duty to use reasonable security measures under HIPAA required Ascension to "reasonably protect" confidential data from "any intentional or unintentional use or

disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

210.     Ascension breached its duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

211.     Ascension's failure to comply with applicable laws and regulations constitutes negligence *per se.*

212.     Plaintiff and Class Members are within the class of persons the statutes were intended to protect and the harm to Plaintiff and Class Members resulting from the Data Breach was the type of harm against which the statutes were intended to prevent.

213.     But for Ascension's wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

214.     The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Ascension's breach of their duties. Ascension knew or should have known that by failing to meet its duties, Ascension's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

215.     As a direct and proximate result of Ascension's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**COUNT III**
**Breach Of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

216.     Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

217.     Plaintiff and Class Members were required to deliver their Private Information to Ascension as part of the process of obtaining services at Ascension. Plaintiff and Class Members paid money, or money was paid on their behalf, to Ascension in exchange for services.

218.     Ascension solicited, offered, and invited Class Members to provide their private information as part of its regular business practices. The Plaintiff and Class Members accepted Ascension's request and provided their private information to Ascension.

219.     Ascension solicited, offered, and invited Class Members to provide their private information as part of its regular business practices. The Plaintiff and Class Members accepted Ascension's request and provided their Private Information to Ascension solicited, offered, and invited Class Members to provide their private information as part of its regular business practices.

220.     Plaintiff and the Class entrusted their Private Information to Ascension. In so doing, Plaintiff and the Class entered into implied contracts with Ascension by which Ascension agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

221.     In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Ascension's data security practices complied with relevant laws and regulations (including HIPAA and FTC guidelines on data security) and were consistent with industry standards.

222.     Implicit in the agreement between Plaintiff and Class Members and Ascension to

provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

223.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Ascension, on the other, is demonstrated by their conduct and course of dealing.

224.    On information and belief, at all relevant times Ascension promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

225.    On information and belief, Ascension further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

226.    Plaintiff and Class Members paid money to Ascension with the reasonable belief and expectation that Ascension would use part of its earnings to obtain adequate data security. Ascension failed to do so.

227.    Plaintiff and Class Members would not have entrusted their Private Information to Ascension in the absence of the implied contract between them and Ascension to keep their information reasonably secure.

228.    Plaintiff and Class Members would not have entrusted their Private Information to Ascension in the absence of their implied promise to monitor their computer systems and networks to

ensure that it adopted reasonable data security measures.

229.    Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

230.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Ascension.

231.    Ascension breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

232.    Ascension breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of Private Information and storage of other personal information after Ascension knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

233.    As a direct and proximate result of Ascension's breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and

(b) remains backed up in Ascension's possession and is subject to further unauthorized disclosures so long as Ascension fails to undertake appropriate and adequate measures to protect the Private Information.

234. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

235. The Plaintiff and Class Members are also entitled to injunctive relief requiring the Ascension to: (i) Strengthen its data security systems and monitoring procedures; (ii) Undergo annual audits of these systems and procedures in the future; and (iii) Immediately provide adequate credit monitoring to all Class Members.

**COUNT IV**
**In the Alternative—Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

236. Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

237. The Plaintiff brings this count as an alternative to the breach of implied contract claim (Count III) above.

238. Plaintiff and Class Members conferred a monetary benefit on Ascension. Specifically, they paid Ascension and/or its agents for the provision of services and in so doing also provided Ascension with their Private Information. In exchange, Plaintiff and Class Members should have received from Ascension the services that were the subject of the transaction and should have had their Private Information protected with adequate data security.

239. Ascension knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Ascension profited from Plaintiff's retained data and used Plaintiff's and Class Members' Private Information for business purposes.

240.     Ascension failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

241.     Ascension acquired the Private Information through inequitable record retention, having failed to investigate and/or disclose the inadequate data security practices previously mentioned.

242.     If Plaintiff and Class Members had known that Ascension would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would have entrusted their Private Information at Ascension or obtained services at Ascension.

243.     Plaintiff and Class Members have no adequate remedy at law.

244.     Ascension enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Ascension instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Ascension's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

245.     Under the circumstances, it would be unjust for Ascension to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

246.     As a direct and proximate result of Ascension's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data

Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Ascension's possession and is subject to further unauthorized disclosures so long as Ascension fails to undertake appropriate and adequate measures to protect the Private Information.

247.     Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Ascension and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Ascension from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

248.     Plaintiff and Class Members may not have an adequate remedy at law against Ascension, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grants the following:

A.     For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

B.     For equitable relief enjoining Ascension from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.     For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class

Members, including but not limited to an order:

i. requiring Ascension to conduct regular database scanning and securing checks;

ii. requiring Ascension to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

iii. requiring Ascension to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

iv. requiring Ascension to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Ascension's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated.

v. requiring Ascension to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

vi. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Ascension's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any

deficiencies with compliance of the Court's final judgment;

D.  For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.  For prejudgment interest on all amounts awarded; and

G.  Such other relief this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims so triable.


Dated: May 23, 2024                                   Respectfully Submitted,

                                   *By: /s/ George A. Hanson*
                                   George A. Hanson (395380MO)
                                   Norman E. Siegel (44378MO)
                                   J. Austin Moore (64040MO)
                                   **STUEVE SIEGEL HANSON LLP**
                                   460 Nichols Road, Suite 200
                                   Kansas City, Missouri 64112
                                   Telephone: (816) 714-7100
                                   *siegel@stuevesiegel.com*
                                   *moore@stuevesiegel.com*

                                   Sabita J. Soneji (application for *pro hac vice* admission
                                   forthcoming)
                                   David W. Lawler (application for *pro hac vice*
                                   admission forthcoming)
                                   *ssoneji@tzlegal.com*
                                   *dlawler@tzlegal.com*
                                   **TYCKO & ZAVAREEI LLP**
                                   1970 Broadway, Suite 1070
                                   Oakland, CA 94612
                                   Telephone: (510) 254-6808

                                   *Attorneys for Plaintiff and the*
                                   *Proposed Class*